Good morning, ladies and gentlemen. Our first case of the morning is case number 117193, People x Rel, Lisa Madigan, versus J.C. Einoder, appellants. Are the parties ready to proceed? Good morning. May it please the court, Richard Krendergast on behalf of the defendants' appellants. As important as this appeal may be to Mr. and Mrs. Einoder, the questions presented are by no means limited in their importance to this case. They address issues of broad applicability, one involving the individual liability of a corporate officer acting in her capacity as such for conduct by the corporation that failed to comply with a requirement of the Illinois Environmental Protection Act. In this case, the individual liability of a corporate officer for the deposit of non-hazardous clean construction and demolition debris where the corporation did not first obtain an EPA permit for the disposal of that material. The significance of the second issue is even broader in scope since it is not limited to the Environmental Protection Act or to other regulations pertaining to the environment. It's a question applicable to any change in a statute that imposes a new liability for past actions upon persons or entities who are not previously subject to such liability. In short, when can such a change in the law be applied retroactively and what is the analytical framework that should be employed to determine retroactivity? Here, the discussion of retroactivity concerns a 2004 amendment to the Equal Protection Act, Section 42E. Prior to that time, the state was not authorized to seek mandatory injunctive relief under circumstances such as those present in this case. By that, I mean with respect to non-hazardous material. Then Section 42E, after the appellate court decided the Agpro case, Section 42E was amended and the state argued before this court that the amendment to 42E did not change the law, it merely clarified existing law. This court rejected that argument and held that the amendment was a change in the law. Now we must determine whether that change in the law, which imposes the extraordinary burden and additional monetary liability associated with mandatory injunctive relief, can be applied retroactively. On the subject of retroactivity, Section 42 was enacted after the conduct in this case had led to a violation, that is, the failure to get a permit for the deposit of clean C&D above grade. And after the site was closed voluntarily in 2003. In fact, the amendment was made after the case was filed, well after the case was filed. Section 42E does not clearly indicate that the amendment was intended to be applied retroactively. That's not a disputed issue. No one disputes, including the appellate court majority, that the first step in the process of analyzing retroactivity, specifically, does the amendment address the issue. It's just not contested here by the state or by anyone else. It doesn't. 42E is entirely silent on that subject. The appellate court then should have analyzed retroactivity by following this court's guidance and decisions in Kaveny, ComEd, Novak. There might be one other one if you include GLSEN in the group of cases. But in any event, the teaching of Kaveny is that you utilize Section 4 of the Statute of Statutes. Once you determine that the amendment itself doesn't specifically address retroactivity, once you're there, you go to Section 4, and you try to determine whether or not the change has a substantive in nature. And I'll deal with substantive and procedural and remedial in just a minute. The appellate court instead erroneously took refuge in a 30-year-old general purposes preamble, Section 2 of the Act, to determine the General Assembly's intent three decades later, when the amendment was enacted. And Judge Mason dissented with respect to this point and concluded that the majority should have followed the analytical framework outlined by this court in Kaveny and ComEd and Novak. Given the substantial case law on this subject in terms of the analytical framework for determining the issue of retroactivity, including not only these cases but the United States Supreme Court's decision in Landgraf, it's difficult to understand why the appellate court did not follow those cases as Judge Mason did in her dissent. It was right out there. It was a major subject of concern. Judge Mason addressed it in her dissent. I have no way of explaining why the majority sought to take refuge in a 30-year-old preamble instead of following the framework that this court had outlined in those cases. Judge Mason did apply the proper framework. She concluded correctly that the amendment could not be applied retroactively. This court's decision in Rivard is also helpful. Rivard says, stands for the fundamental principle of jurisprudence, and this is a quote, that retroactive application of new laws is usually unfair, and the general rule of construction that a statutory amendment should usually be construed as prospective only in its application. And I commend the court to Justice Stevens' opinion in Landgraf because it's a very lengthy and very scholarly discussion of the history and the reasons why you don't apply cases retroactively unless you fit within the framework of the Landgraf decision. And when this court decided Kaveny, it discussed the Landgraf rule and whether you ought to go to stage step two in Landgraf or go to the statute of statutes. The majority of this court chose to go to the statute of statutes. I'm not sure there is any real difference. In any event, the question is whether or not there was some material burden, additional burden established by the change in the law, change in the statute. And if so, retroactive application of that statute is forbidden. Judge Mason understood that and laid it out in her dissent. She applied the framework of Kaveny. There was no clear indication of legislative intent in the amendment. The court should have turned to Section 4. The question then is whether the amendment is substantive or procedural because Kaveny makes clear that Section 4, and quote, forbids retroactive application of substantive changes to statutes. Now, I just want to pause for a minute on this interesting academic discussion about substantive, procedural, remedial because it's an academic subject in this sense. To the extent that a change in the law imposes a new burden of any substantial nature at all, it's substantive. I don't care if you call it remedial. And frankly, that issue was dealt with by the U.S. Supreme Court in some detail. And it actually was the basis for the only dissenting opinion in Justice Blackmun's dissent. If it makes a big difference as to what the consequences of the conduct are, I don't care whether you call it remedial or not. It's a substantive change. It adds a new burden. And it is a fiction to say, well, if it's a remedy, it's kind of procedural. Rivard told us what procedural was. Rivard says procedural is the machinery of carrying out a suit and that the practice means, and I quote, those legal rules which direct the course of proceedings to bring the parties into court, close quote, and the course of the court's proceedings after they are brought in. Rivard, this court, defined what procedural means. We're not talking procedural here. We're talking about a substantive, significant change. Judge Mason pointed out the prior examples of substantive amendments included this court's decision in Dvorak, and Dvorak is a case where she said an amendment imposing new liability to a defendant would be deemed substantive in character. And Dvorak relied on an Illinois Appellate Court case in which this subject was dealt with as a case of first impression. That's Theodosius v. Keishon-Motor. It's an Appellate Court decision, but the Supreme Court cited it in reliance on its determination of retroactivity in that case. Mr. Prendergast? Yes. You were describing procedural issues here. The state, of course, it claims that this is procedural in nature, but I wonder if you could talk about if it is procedural, then the amendment could add costs up to $130 million. How do you figure that in? Well, I call that the third step. If you think of Lansgraf as a two-step analysis or you think about McAveeny as a two-step analysis, the third step is let's suppose that either because there's a statement in the amendment itself or because under Section 4 you determine it's procedural, what would be the third step? And the third step is, and remember, we're talking here particularly about mandatory injunctive relief, an extraordinary remedy. And the third step is are there situations in which even if you find it procedural, you don't apply it retroactively, even if you find it however you classify it as non-substantive. How do you deal with that situation? And that is dealt with in a case, an Appellate Court case called SORCH, S-C-H-O-R-S-C-H. I'm not sure I'm pronouncing it right. And it's also really dealt with in the basic law of mandatory injunctions or injunctions generally. You have to look at the consequences of issuing an injunction, especially a mandatory injunction, which this Court has time and again said is extraordinary relief. And when you're doing that, I think what you need to do is examine what are the additional burden. And if the additional burden is so great or even impossible, then there's an unreasonable and unfair application of the retroactive provision. And this Court or any Court has full authority not to go that way, not to apply it retroactively. In this case, we have a hill that consists of clean construction and demolition debris. It is non-hazardous. It was tested. It was found to be 99.9% clean construction and demolition debris, 0.1% general construction and demolition debris, which is also non-hazardous. Was there testimony from the mayor and the city officials about the removal? There was. One of the things the EPA is supposed to look at and usually does look at is what they call citing when they're deciding to issue a permit or anything. And what they do there is they go to the local officials and say, what's your view on this? The mayor of Linwood testified, don't take down the hill. We don't want all of them to come with trying to remove that. And, by the way, we would like to keep the hill there because we want to put energy-generating windmills on that hill to generate electricity for the surrounding suburbs. Another witness, his name escapes me at the moment, was the head of the multi-municipal organization of municipalities in the south suburban area. He likewise testified. The only, and to that effect, the only witnesses that testified locally to the desirability of taking down this hill were the local officials that supported the defendant's position, and for good reason. There's 750,000 cubic yards of non-hazardous material at this site. It would take 48,000 truckloads to remove it. That's the state's evidence. It would cost anywhere from $8 million to $130 million, depending upon which witness you're talking about, to remove this hill. And, by the way, this is one of those situations where the old adage, if you're going to shoot a bear, you better kill it. You don't want to just wound it. If you started removing this hill and all the vegetation that's grown there, and there's exhibits, I have a sighted exhibit here somewhere, that show what this place looks like now and show what it looked like before they ever started this project, and I can assure you it looks a lot better now. But if you peel away that cap of vegetation that's there, which would be the first step in removing this hill, you'll have an environmental disaster. And one of the reasons the local officials, Your Honor, addressed that issue is they didn't want 48,000 truckloads of material and diesel fuel and everything else spewing around. They said leave it as it is. It's not hurting anyone. Counsel, is adding a provision that adds a mandatory injunction always substantive? Or is it the factual basis here? In other words, if it were a little mound and it took two truckloads, would that be all right? So I'd like to hear you talk about that. That's an interesting question. Because you don't want to deviate too far from the law in mandatory injunctive relief. It's an extraordinary remedy. It's seldom employed, and it's employed very cautiously. So, you know, it's tempting to say, well, you know, it's just one truckload of material and it ought to be ordered removed, and therefore you should apply this retroactively. But I suppose under those circumstances a judge who's considering a mandatory injunction under those circumstances would say, it's no big deal, move it. It's no big burden. This isn't something that's going to overwhelm you. But when you get to the point of 48,000 truckloads of this material, you're dealing with a substantive change. And if you're dealing with a substantive change, this Court has made it absolutely clear that that law cannot be applied retroactively. And in this case, all the facts taken together, clearly it shouldn't have been. Justice Mason understood that, and unfortunately the majority of the appellate court simply didn't follow the framework of Cavini and ComEd and Novak and should have done so and have they done so. The result would have been different. So we should say in this case it's substantive? I would say in any case where you're ordering, when you're making this kind of change, it's a substantive change. And when I say this kind of change, I mean this. This case goes from no injunctive relief, no mandatory injunctive relief at all, but fines are allowed, penalties are allowed, and big ones were imposed here. It goes from fines and penalties and cease and desist orders to a completely different and new remedy. And that's more than simply like, for example, increasing the amount of a fine. It's a complete change in the law. And under those circumstances, I think what the Court needs to do is to say you can't do that. I know that the draconian consequences of doing so are not so great in that circumstance, and there's a temptation to say you can do it. And if there's a way the Court could fashion that exception, I think everyone could live with it. But in terms of, you know, it's the hard cases make bad law situation, where you do have to draw the line someplace and say, no, you can't do that. And we're talking about any mandatory, not just mandatory injunctions, but any change in the law that makes a substantive change, as does this one. By the way, I will speak very briefly on the remedial issue because the State deals with it, for one thing, and because the dissent, I mean the majority opinion dealt with it. And that is to say, this is just remedial. Nothing to it. It's just remedial. It's not substantive. It falls in the procedural bucket. Well, it doesn't fall within the procedural bucket under Rovard, because that's not the definition of procedure. But bear in mind that the Lansgraf decision was a remedy case. The leading case in the United States on this issue, the one that this Court relied upon in Commonwealth Edison and applied in Commonwealth Edison, was a situation in which the plaintiff wanted to utilize a 1991 amendment, Civil Rights Act, to permit her to obtain compensatory damages for workplace violations. And prior to 1991, the law limited the remedy to injunctive relief, cease and desist, and back pay. So there was a component of monetary relief there. And the Supreme Court, in a very carefully crafted, as I said, scholarly opinion, said we're not going to apply that change retroactively and expose the defendant to a new remedy of compensatory damages. It's going to be applied prospectively only. That was a remedy issue. Everything about Lansgraf is remedy. So to come up and say a remedy is really procedural and procedural doesn't count under Section 4, and therefore you should find it non-retroactive, is just erroneous reasoning. It certainly isn't supported by the precedents, including, as I indicated earlier, the Theodosis case, which was the case of first impression and relied upon by this court in Dvorak, which itself was an increase in monetary liability. It was an increase in the cap on wrongful death damages from $10,000 to $15,000. And the Theodosis court, which was cited favorably by this court in Dvorak, said that's a substantive change. If it's a substantive change, this court has spoken. If it's a substantive change, it cannot be applied retroactively. This is a substantive change. The criteria I think you should use is the language from Commonwealth Edison. In that case, the court held that the amendment will not be retroactive if it impairs, quote, rights a party possessed when he acted, increases a party's liability, or imposes new duties with respect to transactions already completed. That's clearly what's going on here. There are new duties imposed by virtue of this mandatory injunction. It impairs rights that the party possessed when he acted, which was the right to be limited to cease and desist order or monetary penalties. And by the way, there's no question if anybody takes the view that, well, these defendants did as they wished and maybe we ought to ignore all of this. They were fined $1,750,000 for the deposit of non-hazardous material. Thank you, counsel. Your time has expired. Thank you. I would like to reserve the time. You have time on rebuttal. And I would like to reserve the opportunity at that time to address briefly the GNSI and odor issue. I'm sorry we took all the time on the first issue. Thank you. Okay. Good morning, Your Honors. Counsel. I am Christopher Turner, the Assistant Illinois Attorney General, here on behalf of Plaintiff Appellee, the people of the State of Illinois, as well, Lisa Madigan. This court should affirm Circuit Court's judgment against John and Janice Eineter and further affirm the court's order that the defendants properly remove and dispose of the illegally dumped waste. Now, both in their brief and here in oral argument, defendants argue quite a bit about the particulars of the scope of this injunction and complain about the injunction and the cost that it may impose upon them. However, that is not the issue in this case. They abandoned their challenge below. They made the challenge in the trial court that, assuming section 42E applied retroactively to this case, that it would be improper under that provision. It was too large. They argued they should cap it or engage in some other mandatory injunction. They also argued that to the appellate court-in-laws. But to this court, they raised one question with regard to that injunction, and that is the retroactive application of 42E, which is a pure question of legislative intent as shown through the principles of statutory construction. Did the General Assembly clearly indicate that it intended that the new equitable remedy it was adding to 42E should apply to address prior violations of the Act? We argue it did. In contrary to what Madison saw, it is a question which does not go to the particulars of the case. The General Assembly did not intend that the new equitable remedy should apply in some circumstances retroactively, but in other circumstances not. Where the particular circumstances of the application of that remedy retroactively do come up is in what really would be the third step, both under Landgraf and under Covini and the other authority of this court. That is, once you've decided what the legislative intent is, then if that retroactive application would violate the Constitution, in that case you obviously can't do so. Now, they haven't claimed that the retroactive application would violate the Constitution, so we don't need to even read that first step here. Rather, in this case, it applies retroactively, as we argue, under the first step because the General Assembly clearly indicated so in the amended Act itself. And secondly, because even if the court finds that it didn't address that, through the statute of statutes section 4, that it had clearly indicated it should apply retroactively, because that changed the statute, and that's the question under Covini, is the change to the statute procedural in nature or is it substantive in nature? Now, counsel also addressed the Landgraf case, which looked at the remedy. And I want to point out that the Landgraf case, both the quotes he gave from Covini were really quotes from the Landgraf case, which all come from when it was looking at section 2 under Landgraf. That is, the second step in Landgraf. Landgraf had two steps we look at to determine retroactive effect, sorry, to the retroactive application. The first is the legislature's intent. Did the legislature clearly indicate that it should be applied so? And if there's no indication either way, under Landgraf, then it becomes a pure judicial inquiry about whether or not it has retroactive effect. In Illinois, we never reach step 2. That was what the decision in Landgraf was made under step 2. We instead found that once if you don't find the legislative intent indicated one way or the other in the amended act itself, you then go to the statute of statutes section 4, which says that it's either procedural in nature, in which case it should apply retroactively, or it is substantive in nature to change, and therefore it only can apply prospectively. In addition, so the decision in Landgraf was made under a step which we never reach in this court. And that is an important distinction, because we are always looking at the questions of legislative intent here in Illinois. That's the only question, until you get to the constitutional question. Now getting back to legislative intent, we do, contrary to the characterization, we do claim that, yes, in the amended statute itself, they did indicate it. But it is in the broad authorization of that new applicable remedy when under the standard principles of statutory construction it is read in conjunction with the other provisions of the act, particularly section 2, general assembly's directives and declarations for the act. That is that its provisions should be construed liberally to effectuate its purposes, and of those purposes it includes to restore and protect the quality of the environment and to assure that the violators of the act bear the cost of the adverse effects. Mr. Turner, both you and the appellate court rely, and I think that's where you started to go, on existing provisions of the act, specifically you said section 2, section 2B and 2C, right? 2C and 2B. Okay. But in Kaveny we expressly stated, quote, if the amendatory act does not contain a clear indication of legislative intent, then it is to be assumed the amendatory act was framed in view of the provisions of section 4 of the statute of statutes. Given that it's the amendatory act that controls under Kaveny, why are we even looking at section 2B and 2C? Because, Your Honor, the real issue is whether there's two reasons. I'm sorry. I mean, the issue is we're finding out did the general assembly clearly indicate the temporal reach. And we do, we are looking here to the amendatory act in the sense that we're looking at the amended language, the broad authorization of that equitable relief. But we are reading it under standard principles of statutory construction in conjunction with the other provisions of the act. Right. And that's my point. My point is it says unless the amendatory act, the amendatory act. So you're saying the amendatory act encompasses the act prior to amendment? Is that what you thought we were saying in Kaveny? To the extent, yes, Your Honor, to the extent that you are reading that amendatory act in conjunction with the other provisions of the act it's amending. And this is consistent with the federal law. And it's actually consistent, really, with the underlying analysis in Illinois as well. For instance, in Kaveny in Illinois, we actually when we don't find the express statement, and we agree that the first thing you look for is there an express statement in the amendatory statute itself. But if you don't find it there, you're still going to determine whether or not there's a clear indication of legislative intent. You're still going to read that provision in conjunction with the other provisions of the act. It's a little hard to get your arms around, isn't it, the fact that we're looking at whether the amendment is, there's either legislative intent in the amendment, and we can look to the other areas of the act. And then if not, let's just say for purposes of argument, your argument, if the 2B and 2C did not have a clear legislative purpose in it with respect to that, then you're looking only to, you would agree, then you'd only be looking to the amendment itself as to whether whatever the amendment brought into play was retroactive or prospective. It's a little hard to get your arms around. No, we actually don't quite agree with that because we agree that in this case the provision we're looking at is Section 2 that you were going to read in conjunction with. But you would still read whatever that amendatory act is in conjunction with all the other provisions if they also for some reason indicate it. And that's, we cite the federal case, U.S.V. Olin Corporation. It looked at the amendments adding the response cost claims under CERCLA. And there was no expressed statement in the amendatory act there itself. It looked at that language in that statute that was being added in light in conjunction with the other provisions, applied the standard principles of statutory construction, and found that, yes, there was a clear indication from the U.S. Congress that it should be applied retroactively. And, you know, the Supreme Court authority since Landgraf is not inconsistent with this. I mean, we haven't cited to it, but there's subsequent cases of clarifying under Landgraf. Once you have, if you don't find the expressed statement, you still apply the standard principles of statutory construction. Looking at that statute in light of the act as a whole that you're doing to find out is to determine is there a clear legislative indication that it should be applied retroactively. I could give you one site that just lays out those principles. Fernandez-Vargas v. Gonzalez, 2006 case at 548 U.S. 30, I believe at page 37. It just kind of goes through. Under the first step in Landgraf legislative intent, look for an expressed statement. If not, you apply standard principles of statutory construction. And that is consistent with the U.S. v. Olin Corporation court case that we cited. Now, if the court doesn't, even if the court doesn't agree with us, that that provision, that when you look at that, that broad authorization in light of that Section 2's declaration and its directive, that that doesn't provide a clear indication of the general legislature's intent. When you look under the statute on statutes, whether the change is procedural in nature versus substantive in nature, then you think it still is procedural in nature and, therefore, should be applied retroactively. And that's because it only added a new remedy, a new equitable remedy. Mr. Turner, I want to go back a little bit. Isn't this particularly, the section, more permissive? It says may in E. Isn't that correct? In 42A, it says may. The Attorney General may at the request of the agency. Correct, yes. And so if that's permissive in some way, then, however, it appears that this particular landfill ceased its operations in 2003. So this is a pretty fact-intensive case. And if they ceased the operation in 2003, this was one year before the amendment. Isn't that correct? Correct, yes. And so you're arguing now why it should be applied retroactively when they did cease and desist, even though that the remedy is so detrimental to the respondent and it seems that the city council and the other people there are not necessarily agreeing with the Attorney General's position. Is that correct? No, we would disagree. Well, we agree the mayor did, yes, testify that they disagreed. That the hill should stay. But that doesn't go to the question of retroactivity, Your Honor. That goes to the challenge to the injunction, which they are no longer bringing to this court. While they do complain about it, when you're looking at whether or not the change to the statute should be applied retroactively, you're looking at legislative intent. You're looking about did the legislator indicate it in the act, or is the change to the statute adding this new relief procedural nature? The question of whether or not their particular injunction and their disagreements, they thought that it should have been a different injunction or a lesser injunction given the circumstances of the case. Now, we dispute that, too. But still, that is not relevant to the question of retroactivity, except to the extent that they did claim that it violated the Constitution, which they don't claim. So our argument is that that simply is relevant to this analysis. Mr. Turner, what was your authority pre-amendment on injunctions? Section 42E, Your Honor, would have been. What specifically was your authority? That we were proceeding when we. . . I'm saying let's put the retroactivity aside. Just take a look at the statute pre-amendment. Did you have authority for an injunction or not? We believed we did. The first case, which actually. . . The first case that ever claimed that we didn't, that decided that we didn't have the authority, came down with the appellate court decision in Act Pro in 2004. So when the original action was filed in 2000, the EPA and the Attorney General believed that it did have the authority to order a mandatory injunction, Your Honor. That had been its assumption all along until the court corrected and said, no, it's wrong. Under the language of the statute, you do not have that authority. So that's what we would have proceeded under at that point. But before the trial started, while Act Pro has decided that that was when this amendment was made, that was before the trial. . . Actually, that was before even, I think, the second amended complaint was filed, which is the operative complaint in the case. So at that point, when we filed the second amended complaint, we were proceeding under the current version of 42E. Now, as I mentioned before, the defendant pointed out that the Landgraf decision addressed remedy, a new relief. In that case, it was an amendment adding other kinds of compensatory and pecuniary damages to the Civil Rights Act, which before that amendment, there was absolutely no monetary relief at all. Afterwards, it provided compensatory damages. In applying the second step of Landgraf, which we don't have here, In that case, it decided that yes. It said it was a close call. It said it was a difficult decision. There are pages 282 to 283, whether or not that addition would be of new compensatory damages. But they decided in that case that it did have the kind of retroactive effect that it shouldn't be applied retroactively. Now, that was the opposite situation of here, though. Here, the Act has only provided, during the time of the conduct, significant monetary penalties for the conduct that they engaged in. I mean, as they pointed out, over a million and a half dollars were eventually imposed on them, but they actually, under the statutory cap, would have been several millions, many millions of dollars more. There was no doubt that they were subject to significant monetary relief for their violations at the time. The only change was a new remedy, which is the flip side here, of an equitable remedy for how do we address the current ongoing damage that resulted from that. So if you look at Landgraf, when it decided that the close call on compensatory damages, that that had the kind of retroactive effect that it shouldn't be applied, it was because of what's called the quintessential nature, backward-looking nature, of compensatory damages. It thought that that kind of edged it, that that kind of backward nature made it more substantive. While in this case, and when pages 272 to 273 discussed the injunctive relief when it was talking about retroactive effect, it thought that's prospective relief, which doesn't have a retroactive effect. So to the extent you want to look at Landgraf as instructive here, it shows that no, the type of relief, the kind of change that's going on here is procedural. They were always subject to significant monetary relief. The only difference here is what can the state now do to address the current ongoing damage? The question for procedural versus substantive, as this court has framed before, is you have on the one side, you have liability. On the other side, you have remedy, relief, or procedures. It's always put remedy and relief with procedures. And we cite, for instance, the Dardeen v. Hartland Manor case, where there was the elimination of a treble damages provision. But the analysis that this court provided in order to determine that it was remedial in nature, and therefore it said procedural in nature and should apply retroactively, was because it didn't affect the substance of the act. It didn't change the conduct that was subject to liability. It didn't change the elements of proof or the grounds for recovery. Instead, it just looked at the relief, the type of relief. The cases that the defendants relied upon, the Rivard case that they cited to and the Dvorak case, those weren't looking at additional relief. They were actually looking at amendments that were made that either provided that whole new plaintiffs had causes of action against the defendant or defendants who entities that were not subject to suit before had no liability were now subject to suit. In those cases, you had whole new liability in those cases. Defendants who couldn't be liable at all were not liable. I think that's the Dvorak case. In the Rivard case, it was that they would be liable to whole new entities who couldn't sue them before. That's the key distinction here. Here we just are looking at the remedy or relief that is provided for that is now unquestioned liability in conducts that were in violation of the act. We cite, for instance, though, other appellate court cases since Theodosius. They looked at the Theodosius case, which was the one case that looked at a change in monetary relief. But there were two important distinctions, the first being that it was a statutory cap. If you look at the analysis at page 25, that's the analysis that Theodosius' case really relied on. It said, we think this is analogous to a substantive change because we look at the statutory cap as providing an affirmative right against further monetary relief. Now, when you remove that, it's like it was sort of a substantive right that had been vested now that has been taken away and can be a subject to additional damages. When the appellate court later looked at another change adding monetary relief, the case we cite is Winter and Hirsch, at that point, that changed to the usury statute added additional monetary penalties. There's no dispute that that was the case. But the court provided the same analysis in Dardeen. That is, but this doesn't change the liability. This doesn't go to the conduct which subjected those parties to those penalties. It didn't change how you prove those penalties. When you have that kind of change, that is procedural in nature and, therefore, it can be applied retroactively. We also cited the Cannon v. Whitman case, which was another appellate court case, where it then added, like here, new equitable relief. It provided an authority for mandatory injunctions. And in that case, the court decided that it was purely remedial. The change was remedial in nature and, therefore, procedural, and so could be applied retroactively. Are you suggesting that we would have to overrule a clear precedent on the issue of whether this new remedy is simply procedural if we disagreed with you? If you disagreed with us? Right. You would certainly have to overrule, I believe, the cases in Winter and Hirsch, and you'd have to overrule the Cannon v. Whitman case, yes, Your Honor. Those cases are adverse to that decision. And if you were to find our way, you really don't have to rule Theodosius, because in that case it is distinguishable for both reasons. One, it was a statutory cap, which was providing an affirmative right under the analysis of that case. And also, in that case, it was looking at a change in monetary relief. Like here, it is substantively different. You're adding a new equitable remedy when already they were subjected to significant monetary relief anyway. But that kind of change is procedural in nature. Your Honors, for the reasons set forth in our brief and argued here, we ask that you affirm the judgment in its total both against John and Janice Anader and also affirm the order requiring the defendants to remove and properly dispose of the waste at the site. Thank you. Mr. Prendergast, would we have to overrule prior precedent to agree with you? I don't believe so, Your Honor. I think that what you'd have to do, if you didn't agree with me, is somehow overrule or depart from Kaveny, Commonwealth, Edison, Novak, the leading Supreme Court cases on the subject, all of which emanate from landscape. So I think that's the greater concern. A couple of things. Let's be clear on one thing. I don't know exactly the point the counsel was making there, but I want to be clear. It is not disputed, and certainly wasn't disputed by the appellate court majority, that the amendment does not address retroactivity. The only way they get to retroactivity is by saying go to Section 2 of the Act, which is basically the preamble of the Act. And as Justice Mason pointed out, if you're going to go to the preamble of an Act that's 30 years old to figure out legislative intent 30 years later, then you might as well throw out all this analysis and we'll just go to the preamble of any statute, because it's always going to have general purposes language in it that you can use as a foundation for any change you make in the law. That's the reason I hope that this Court didn't follow that or didn't pursue that line of reasoning in Kaveny or Commonwealth, as in any of those cases. You laid out a very clear way to do this. I noticed in the Kaveny case that there was a disagreement among the Court as to how you get to where you get, but there were seven members of this Court that voted the same way in Kaveny. One would have applied, one group, the majority would have gone to Section 4, and the remaining three would have said just follow Lange's graph. But I think it's a distinction without a difference. I think at the end of the day, did you impose a new burden on someone? If you did, it's substantive. If you did, it is under either case. It cannot be applied retroactively. Another point that counsel raised was the fact that in Lange's graph, there was no monetary relief in existence prior to the amendment. There was. You could have gotten back pay in the previous rendition of the statute. They added compensatory damages. The question was, is that additional remedy substantive? Or in that case, did it change the rules? Did it add additional burden? It did. It can't be applied retroactively. Eight members of a nine-member Court held that that did. So that wasn't a closely – it was just characterized as a closely contested issue. Eight out of nine is pretty much an overwhelming majority. I want to ask the Court whether – and I don't want to be unfair about this. I used my time on this subject. I did not get to Janice Einoder. Counsel did not raise Janice Einoder in his arguments. So I need some guidance as to whether I can go there. I think you asked to reserve at counsel, and I allowed that. Thank you. So you may. Obviously, it doesn't expand your time. I appreciate that. If you choose to use it that way, you may do so. Unless the Court has any further questions on the retroactivity issue, I would like to touch only on a couple of the key aspects of the Janice Einoder issue. And that is that Janice Einoder – we've covered this in our briefs very thoroughly, I believe. And so I'm not going to try to repeat all of that. But the cases on this are fairly uniform, that if you don't have personal involvement and active participation in your own personal capacity and not as an officer or not as an employee of the company, you do not have personal liability. And the reason for that is – and in the limited time, I'll use the best example I can use. There are a lot of disposal companies that dispose of waste in the environment in the state of Illinois. The largest is probably waste management. They probably have, I'm sure, a lot of executives. They probably have a lot of people who are at high levels in management personnel. They probably all sign contracts just like Janice Einoder signed contracts. They probably all have some exposure to the knowledge of the operations at the site, probably far more than Janice Einoder had. And the Petco decision is the key decision here because of the language of that case. In Petco, you had an executive who knew everything that was going on and had been at the site and visited the site and actually had written checks to landowners to compensate them for damage done at the site. The Petco court held that's not personal involvement and active participation. That does not satisfy the criteria. And given the Petco case and the Tang case, the activities of Janice Einoder, with respect to the site, with respect to the – and I don't mean that she has to go out there in order to be liable and unload material or directly unloading material. But she just was not actively involved in the operation of this site. She had a company that was actively involved by virtue of the fact that the machinery and personnel were leased to the other company, Tri-State. But she was not actively involved. That company that she did have engaged in a lot of other business, a lot of snow removal business and contracts with cities and contracts with private enterprises. And there she was very hands-on. That's the testimony. She directed employees. She told them what to do. She didn't do any of that in this case, far less than what was done in the Petco case. And if you're going to follow Petco and if you're going to follow Tang, then Janice Einoder does not have personal liability here. And I think one of the most interesting points in highlighting that is that – because they want to look at the trial judge's assessment, and that's a fair look. Look at the difference in the fines. $750,000 for Tri-State, John Einoder's company. $500,000 for JTE, Janice's company where she leased the – it leased its personnel and machinery to Tri-State. $500,000 for John Einoder, $27,000 for Janice. Do you think the trial judge understood the de minimis nature of her involvement here? That's not active participation. That's not personal involvement. That doesn't satisfy the criteria of Petco. And she should not have been found liable in this case personally. Her company, yes. John's company, yes. John, you know, Your Honors, we could have come in here and tried to spin a tale about how John Einoder wasn't personally involved and actively participated here. We didn't do that. John Einoder was on site. He ran this whole operation. He even ran the operation of Janice's company at the site. Janice visited that site like 10 or 12 times in 10 or 12 years. And then, on several occasions, just stayed in the car where her husband was there. And on other occasions, she dropped off holiday gifts and bonuses to her employees. Mr. Turner would say that back to the contracts, that she wasn't merely effectuating a corporate decision in signing the contract but instead played a substantial role in making the decision. You know, Your Honor, if you look at those contracts, you'll see that the actual price that's to be charged each truck is determined by the person on site. She signed those in a ministerial capacity as president of the company, just like my hypothetical waste management executive. They probably sign a lot of contracts on behalf of the company. Signing those contracts is an act of an executive in a company. It is not personal involvement, an act of participation. And the trial court and the appellate court seized on that one particular act because they couldn't put her at the site. They couldn't have her involved in any of that. They couldn't have her supervising employees. None of that existed. In fact, the state goes out of its way to run away from the testimony of two of its own witnesses. Bruni was the chief investigator on the site, and Schlossberg was the chief state police officer who served as an inspector on the site. And Schlossberg said she had nothing to do with the operation, and Bruni said she had nothing to do with the operation. That's the testimony in this case from the state's witnesses. They say, as did the appellate court, well, maybe Schlossberg didn't know she signed contracts. Maybe he didn't, but it doesn't make any difference. She wasn't involved in the operations, and the signing of the contracts was a decision of an executive of a company, just like any of those executives at waste management. If we're going to make that the law, there's an awful lot of people out there that are suddenly going to be vulnerable to court orders that require them to remove non-hazardous material individually and are going to be subject to huge fines, just as the other three defendants were subject to fines. Thank you very much. Unless there's other questions. Thank you, Counsel. Thank you, Ronnie. Case number 117193, People ex Rolisa Madigan v. J.T. Eineter. And all appellants will be taken under advisement as agenda number 13. Mr. Prendergast and Mr. Turner, thank you for your arguments today, and you're excused at this time.